UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JENE-ELISE STAHURA-UHL,

                         Plaintiff,

         v.                                                    **DECISION AND ORDER**
                                                                09-CV-784S
IROQUOIS CENTRAL SCHOOL
DISTRICT, NEIL ROCHELLE,
BRIAN WEISINGER, KIMBERLY OAR,
and KRISTEN KENDALL-JAKUS,

                         Defendants.

## I. INTRODUCTION

Plaintiff, Jene-Elise Stahura-Uhl, brings this action against the Iroquois Central School District ("School District" or "District") and four individual defendants, all of whom served in a supervisory capacity for the School District. Plaintiff alleges that Defendants unlawfully retaliated against her for exercising her rights under the First Amendment and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504" or "Rehabilitation Act"). She further alleges state law defamation and intentional infliction of emotional distress claims. Presently before this Court is Defendants' motion to dismiss (Docket No. 23). For the following reasons, Defendants' motion is granted with respect to Stahura-Uhl's First Amendment and state law claims, and the motion is denied regarding her Section 504 claims.

## II. BACKGROUND

**A.     Facts[1]**

Stahura-Uhl's allegations arise out of her employment as a special education teacher for the School District, a position she began in the 2000-2001 school year at Wales Primary School. (Amended Complaint ¶ 11-12; Docket No. 20.)  Plaintiff, according to her complaint, received accolades for her work during the first few years of her employment. (Id. ¶ 16-18.) That began to change in the 2006-2007 school year when Defendants Oar, as Principal of Wales, and Kendall-Jakus, as Director of Instruction, were assigned as her supervisors. (Id. ¶ 19.) Stahura-Uhl alleges that Oar, under the direction of Kendall-Jakus, consistently deprived her disabled students of necessary equipment and resources that were mandated by state and federal law. (Id. ¶ 20.) Specifically, she alleges that Individual Education Plans ("IEP") were not followed (Id. ¶ 24), that IEPs were modified without hearings (Id. ¶ 85), that requests for personal aides were summarily denied (Id. ¶ 34), that personal aides, and in particular the personal aide of "Student A," were improperly removed from her classroom (Id. ¶¶ 55-58, 130), and that a higher functioning, regular education student was improperly placed in the same classroom as her special education students. (Id. ¶ 38.)

Stahura-Uhl claims that throughout her tenure at the School District she attempted, through various means, to rectify these problems as they arose. In a September of 2006 meeting, for example, she reported problems and requested, among other things,

---

[1]Facts alleged in Plaintiff's complaint are accepted as true for the purposes of resolving this motion.

additional classroom support from Oar, who allegedly denied Plaintiff's request and criticized her for making it. (Id. ¶¶ 29-31.)

Later, Stahura-Uhl called the mother of the student whom she believed needed a personal aide, and discussed with her federal and state regulations pertaining to that subject. (Id. ¶ 35.)

Regarding the higher functioning student in her class, she complained to Oar (Id. 41), and called the School District's social worker and psychologist in an effort to find a more suitable placement. (Id. ¶¶ 42-43.)

She also complained to Oar and Kendall-Jakus regarding the IEP modifications, resource deficiencies, and removal of personal aides. (Id. ¶¶ 60, 72.) In a September of 2007 meeting with Oar and Kendall-Jakus, Stahura-Uhl complained that she lacked adequate planning time and that mainstreaming[2] her students – as Kendall-Jakus planned to do – was inappropriate. (Id. ¶¶ 80-82.) When Kendall-Jakcus did not heed her complaints, Stahura-Uhl once again contacted Kendall-Jakus to express her concerns about the special education program. (Id. ¶ 89.) Stahura-Uhl then contacted the parents of her students to instruct them of this change and to inform them that the change violated various regulations. (Id. ¶ 87.) She also discussed these "unlawful acts" with her co-workers. (Id. ¶¶ 43, 87.)

---

[2]Although not entirely clear from the complaint, "mainstreaming" appears to refer to the act of removing special education students from self-contained classes and mixing them with regular education students in one class.

3

Subsequently, in November of 2007, at a meeting with Oar and Kendall-Jakus, Stahura-Uhl again tried to raise the issue concerning the lack of personal aides, and her request was again denied. (Id. ¶¶ 113-114.)

Regarding Kendall-Jakus' decision to remove the personal aide from "Student A," Stahura-Uhl asserts that she attended the students' Committee on Special Education ("CSE") meeting and expressed her views that the aide should not be removed. (Id. ¶ 130-131.) She also discussed this problem with Student A's grandmother. (Id.)

None of the perceived deficiencies asserted in her complaints were ever corrected, instead, as detailed below, Stahura-Uhl claims that she was repeatedly retaliated against for raising her concerns. (Id. ¶ 77)

First, Stahura-Uhl alleges that, in January 2007, she was issued a "Summary of Supervision," which appears to be a memorandum containing demerits against her record. (Id. ¶ 47.) Thereafter, Oar told the School District staff that Stahura-Uhl was "unprofessional," "promoting adversarial relationships," and "was not performing her duties in a competent manner." (Id. ¶ 52.) Oar also, "through statements and innuendo," informed Plaintiff's colleagues that anyone who aligned with Stahura-Uhl would be treated in a similar fashion. (Id. ¶ 55.)

Stahura-Uhl believes that she was often the victim of selective punishment for trivial violations such as allowing an aide to supervise students on the playground (Id. ¶ 67) and arriving mere minutes late. (Id. ¶106.) She further asserts that notes detailing these reprimands were "maliciously inserted" into her employment file. (Id. ¶ 71.)

4

She also believes she was passed over for a transfer to another school and claims that she was reprimanded for applying for the transfer. (Id. ¶ 96.)

In late 2007, Neil Rochelle, the School District's Superintendent, informed David Uhl, Plaintiff's union representative, that if Stahura-Uhl continued to express her concerns about the School District's policies to the children's parents, disciplinary action would be taken against her. (Id. ¶ 100.) Rochelle advised Uhl to instruct Stahura-Uhl to refrain from such activity. (Id.) With that, Stahura-Uhl ceased contacting School District parents. (Id. ¶ 103.)

Stahura-Uhl also alleges that Kendall-Jakus reprimanded her when she called another teacher concerning Student A's ability to function without his aide (Id. ¶ 144), and that notes regarding this discussion were again "maliciously inserted" in her file. (Id. ¶ 145.)

In further retaliation, Stahura-Uhl alleges that Kendall-Jakus closely monitored her teaching (Id. ¶ 149) and, along with the Rochelle, suspended her for six days at the end of the 2006-2007 school year. (Id. ¶ 153.) The reasons for suspension contained false information and were allegedly distributed to "others at the district." (Id. ¶ 155).

In the summer of 2008, after a meeting with Rochelle, Kendall-Jakus, and the School District's legal counsel, Stahura-Uhl was told by her union representative that if she insisted on continuing her employment with the District or attempted to "clear her name," that the District would "blackball" her and "force[] her out of a job." (Id. ¶ 163.)

Stahura-Uhl was also frequently transferred around the District, including transfers in December 2007 (Id. ¶ 117), at the end of the 2007-2008 school year (Id. ¶ 167), and twice more between June and August of 2009 (Id. ¶ 178.) She considers each of these

transfers a demotion. (<u>Id.</u> ¶¶ 117, 167, 168, 178 .) After the first transfer, Kendall-Jakus instructed her not to discuss the transfer with any parents and that if she did, she would face disciplinary action. (<u>Id.</u> ¶ 120.) As noted above, Stahura-Uhl feels all of these acts were taken in retaliation for expressing dissent.

## B.     Procedural History

Stahura-Uhl filed a complaint in this Court on September 4, 2009 (Docket No. 1), which Defendants moved to dismiss on November 13, 2009 (Docket No. 5). Thereafter, Stahura-Uhl cross-moved for leave to file an amended complaint (Docket No. 10), which was eventually stipulated to and filed on January 13, 2010 (Docket Nos. 18, 20.) Defendants filed the present motion to dismiss on February 12, 2010. (Docket No. 23.)

## III.  DISCUSSION

## A.  Motion to Dismiss Standard – Rule 12(b)(6)

Rule 12 (b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12 (b)(6). Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim. Fed. R. Civ. P. 8 (a)(2). But the plain statement must "possess enough heft to show that the pleader is entitled to relief." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).

Legal conclusions, however, are not afforded the same presumption of truthfulness.  See Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)  ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S. Ct. at 1945 (quoting Twombly, 550 U.S. at 570).  Labels, conclusions, or a "formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged.  Iqbal, 129 S.Ct. at 1949. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief.  Id. at 1950; Fed. R. Civ. P. 8 (a)(2).  Well-pleaded allegations must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Courts therefore use a two-pronged approach to examine the sufficiency of a complaint, which includes "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits."  Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). This examination is context specific and requires that the court draw on its judicial experience and common sense.  Iqbal, 129 S.Ct. at 1950. First, statements that are not entitled to the presumption of truth — such as conclusory allegations, labels, and legal conclusions — are identified and stripped away. See Iqbal, 129 S.Ct. at 1950. Second, well-pleaded, non-

conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief." Id.

**B.      42 U.S.C. § 1983**

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Plaintiff's § 1983 claims arise under the First Amendment.

**1.      Constitutionally Protected Speech**

Stahura-Uhl alleges that Defendants retaliated against her for speaking out against the School District's policies and procedures regarding its special education department. She claims that such retaliation violated the First Amendment. Defendants respond by arguing that Stahura-Uhl cannot state a claim for First Amendment retaliation because Plaintiff's various statements were made as part of her official duties as a teacher, and thus, under Supreme Court and Second Circuit precedent, are not constitutionally protected.

Regardless of the factual context, the Second Circuit requires a plaintiff who alleges retaliation to establish that her speech is protected by the First Amendment. Williams v.

8

Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). To determine whether speech is protected, courts must ask: (1) whether the employee spoke as a citizen (2) on a matter of public concern." Suosa v. Roque, 578 F.3d 164, 170 (2d Cir. 2008) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). "If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.' Id. (quoting Garcetti, 547 U.S. at 418).

Recognizing that government employers "have heightened interests in controlling speech made by an employee in his or her professional capacity," the Supreme Court ruled that a public employee speaking in his official capacity is not speaking as a citizen for First Amendment purposes. Id. at 421-422.

Thus, to state a First Amendment retaliation claim, a public employee, such as Plaintiff, must allege: (1) that she engaged in constitutionally protected speech; (2) that her employer retaliated against her by performing an "adverse employment action"; and that (3) the speech was a motivating factor in the adverse employment decision. Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006) (internal quotation marks and citation omitted).

Defendants concede that Stahura-Uhl spoke about a matter of public concern, but argue that Stahura-Uhl cannot pass the first prong of the analysis because she spoke only in her professional capacity. Defendants cite a series of cases in support of this contention. Last year, for example, the Second Circuit ruled that a plaintiff teacher, who complained to his superiors and filed formal grievances challenging a school's decision not to discipline a student, could not assert a First Amendment claim because his actions fell within his

official duties. <u>Weintraub v. Bd of Educ. of the City School Dist. of the City of New York</u>, 593 F.3d 196 (2d Cir. 2010) ("<u>Weintraub (2d Cir.)</u>").[3] The court found that his speech was "part-and-parcel of his concerns about his ability to properly execute his duties." <u>Id.</u> at 694.

This finding, Defendants point out, aligns with previous Second Circuit holdings and with several district court decisions. <u>See, e.g.</u>, <u>Woodlock v. Orange Ulster B.O.C.E.S.</u>, 281 Fed. Appx. 66 (2d. Cir 2008) (complaints to supervisor about lack of classes for special education students not protected); <u>Shums v. New York City Dept. of Educ.</u>, No. 04-CV-4589, 2009 WL 750126 ( S.D.N.Y. Mar. 17, 2009) (English as a Second Language ("ESL") instructor's complaints about classroom size and scheduling not protected); <u>Rodriguez v. Int'l Leadership Charter Sch.</u>, No. 08 Civ. 1012, 2009 WL 860622 (S.D.N.Y. Mar. 30, 2009) (ESL teacher's complaints about lack of services for her students not protected).

Stahura-Uhl essentially responds with three arguments: (1) the cases that Defendants cite are distinguishable; (2) Stahura-Uhl was not merely complaining, but rather scrutinizing and critiquing her supervisors, which is not within her official duties; and (3) that decision – whether or not she was speaking in her official capacity – should be left to the fact-finder.

In attempting to distinguish Defendants' cases, Stahura-Uhl argues that the teachers from those cases only complained through "established institutional channels" and that when an employee goes outside those channels, as Stahura-Uhl claims she did, she is

---

[3] See below, pp. 11-16, for a fuller discussion of this case and its history. By way of a brief explanation, there are three related cases bearing the name "<u>Weintraub v. Bd of Educ. of the City School Dist. of the City of New York</u>." The first was brought in the Eastern District of New York in 2006; a year later the same court granted a motion for reconsideration and re-heard the case. Three years after that, in 2010, the Second Circuit took the case on an interlocutory appeal.

speaking as a public citizen, not an employee. In so arguing, however, Stahura-Uhl appears to concede that her complaints to Oar, Kendall-Jakus, and other supervisors were not protected.

Indeed, Stahura-Uhl must concede this point: it is clear that complaints that do follow the "established institutional channels" are not protected. In Garcetti, for example, the plaintiff was a deputy district attorney who wrote an internal memorandum in which he expressed concerns about the accuracy of an affidavit supporting a warrant and recommended dismissal of the underlying criminal case. Neither party disputed that the plaintiff "wrote [the statements at issue] pursuant to his official duties" and thus the Supreme Court found that his statements were unprotected. Garcetti, 547 U.S. at 424. Likewise, in the cases cited above, the plaintiffs were foreclosed from asserting a First Amendment claim because their complaints were made to supervisors. See, e.g., Weintraub v. Bd. of Educ. of City of New York, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2007) ("Weintraub II") (collecting cases and finding that "the general principle running through these and other cases applying Garcetti to similar situations is that, when a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor . . .  he or she is speaking as an employee and not as a citizen"); accord Davis v. Mckinney, 518 F.3d 304, 313 (5th Cir. 2008) ("When a public employee raises complaints or concerns up the chain of the command at his workplace about his job duties, that speech is undertaken in the course of performing his job.")

Therefore, Stahura-Uhl cannot assert claims arising out of complaints made to her supervisors, even if such complaints can be categorized as "scrutinizing or critiquing."

However, this does not entirely dispose of Stahura-Uhl's claim, as she also alleges

11

that she expressed her concerns to parents, co-teachers, social workers, and a psychologist – individuals who are clearly not "up the chain of the command." See Davis, 518 F.3d at 313.

 The Weintraub cases, two of which are cited above, with their somewhat unique procedural history, are instructive on this point. Weintraub was a teacher who complained about the lack of disciplinary actions taken against a student who twice threw books at him while he was teaching. He eventually brought a claim asserting that the defendant-school retaliated against him for exercising his First Amendment rights. Weintraub v. Bd. of Educ. of City of New York, 423 F. Supp. 2d 38 (2006) ("Weintraub I"). The Eastern District of New York held that Weintraub's complaint to his supervisor and subsequent grievance were protected by the First Amendment. Id. at 52. A year later,  however, Weintraub moved for reconsideration in light of the Supreme Court's recent Garcetti decision.

On reconsideration the Eastern District identified three categories of speech for which Weintraub could claim retaliation: (1) his private conversation with his supervisor; (2) Weintraub's conversations with other teachers; and (3) the filing of a formal grievance. Weintraub II, 489 F. Supp. 2d at 214. Based on Garcetti, the court granted summary judgment in favor of the defendants with respect to the first and third categories, but, significantly, denied summary judgment with respect to the second category, holding that "Weintraub's conversations with other teachers about his conflict with [his supervisor] . . . [were] clearly not within the scope of his employment duties." Id. at 220.

This decision was then affirmed on an interlocutory appeal, but the Second Circuit's decision was "limited to the question of whether the First Amendment protects [Weintraub's] filing of a grievance." Weintraub v. Bd. of  Educ. of City of New York, 593

F.3d 196, 200 (2d Cir. 2010) ("Weintraib (2d Cir.")).  It said nothing about whether the First Amendment protected Weintraub's comments to his co-workers.

Therefore, asserts Stahura-Uhl, the statements she made to co-workers and parents, like those in  Weintraub, were outside her official duties as a teacher.

Defendants attempt to distinguish Weintraub II, arguing, "in contrast to Weintraub – where the disagreement was over the handling of an administrative matter – Plaintiff's speech was over a pedagogical matter that was central to Plaintiff's role as an educator." (Defendants' Reply Memorandum, p.4; Docket No. 30.)

As an initial matter, this Court disagrees with Defendants' characterization of Weintraub's complaint. The Eastern District, in Weintraub I, described the plaintiff's complaint as evincing a "general concern for safety in the classroom and school." 423 F. Supp. 2d at 52. The Second Circuit determined that his complaint concerned "indispensable prerequisite[s] to effective teaching and classroom learning." Weintraub (2d Cir), 593 F.3d at 203. This is not simply an "administrative matter" as Defendants try to paint it; instead, like Plaintiff's complaints, Weintraub's speech concerned his ability to control his classroom and effectively perform his duties.  Both here and in Weintraub, the plaintiffs' complaints involved pedagogical matters concerning their duties as a teacher.

Of course, the Weintraub II court, coming to this conclusion, still determined that the plaintiff's speech fell outside the parameters of his job as a teacher, reasoning:

> Weintraub's conversations with other teachers about his conflict with [the supervisor], however, are clearly not within the scope of his employment duties. He had no official duty to discuss the matter with his colleagues, nor did he do so as part of a formal dispute-resolution process put into place by his employer. Thus, when speaking to his co-workers about his concerns regarding school safety and [the supervisor's]

13

> handling of the book-throwing incidents, Weintraub was speaking as a citizen rather than as an employee.

Weintraub II, 489 F. Supp. 2d at 220.

But this Court finds that such a conclusion, made without the advantage of the Second Circuit's guidance, is off the mark.

Although it answered a different question, in interpreting Garcetti, the Second Circuit found that "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description." Weintraub (2d Cir.), 593 F.3d at 203. While it is true that the court also looked to whether the speech has a "relevant analogue to speech by citizens who are not government employees" the conclusion that Weintraub's complaint concerned his official duties was only "*supported* by the fact that his speech ultimately took the form of an employee grievance." Weintraub (2d Cir.), 593 F.3d at 203-04 (emphasis added). As several courts in this Circuit have noted, this factor alone, which appears to be interchangeably referred to as the "relevant analogue" or "institutional channels" factor, is not dispositive. See, e.g., Castro v. County of Nassau, 739 F. Supp. 2d 153, 179 (E.D.N.Y. 2010); Williams v. County of Nassau 779 F. Supp. 2d 276 (E.D.N.Y. 2011); Adams v. New York State Educ. Dep't, 752 F. Supp. 2d 420 (S.D.N.Y. 2010). Simply put, a plaintiff who speaks outside of those institutional grievance channels, as Stahura-Uhl alleges she did here, is not automatically protected.

Instead, the Garcetti Court instructed that the test is a "practical one." Garcetti, 547 U.S. at 424-25. Combining this test with the Twombly/Iqbal rule, that courts may view the plaintiff's factual allegations in the light of the court's "judicial experience and common

sense," it becomes evident that Stahura-Uhl has not stated a cognizable claim.[4] <u>See</u> <u>Adams</u>, 752 F. Supp. 2d at 429-31 (citing <u>Iqbal,</u> 129 S.Ct. at 1950).

Stahura-Uhl's complaints to co-workers and parents cannot be reasonably categorized as falling outside her official duties. It takes no standardized employee handbook or directive from the School District for this Court to conclude that in addition to instructing her students, a teacher should also advocate on their behalf. This includes communicating with other teachers when concerned about a student's progress;[5] and it must also include communicating with the student's parents when the teacher believes that the District is not properly providing for its students. <u>Accord</u> <u>Rohrbough v. Univ. of Colorado</u> <u>Hosp. Auth.</u>, 596 F.3d 741, 747-48 (10th Cir. 2010) (finding that a hospital employee's complaints to other hospital employees fell "squarely within the scope of her official duties."); <u>Winder v. Erste</u>, 566 F.3d 209, 215 (D.C. Cir. 2009) "[A] public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command.") Stahura-Uhl's speech "owe[d] its existence to [her] professional responsibilities" as a teacher, and as such, is unprotected. <u>Garcetti</u>, 547 U.S. at 421-22. Her complaints are a keen example of an act that is "part-and-parcel" of her duties as a teacher. <u>Weintraub (2d Cir.)</u>, 593 F.3d at 203.

---

[4]Stahura-Uhl's argument that this determination should be left to the fact-finder is without merit. The question of whether or not the First Amendment protects certain speech is clearly one of law, not fact. <u>See</u> <u>Connick v. Myers</u>, 461 U.S. 138, 148, nn. 7, 10, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).

[5]This is especially true given the nature of Stahura-Uhl's job as a special education teacher. Because she presumably shares students with other teachers, she would be expected to communicate with those teachers about her students' status.

The Second Circuit has commented that "a police officer speaking to a public official about his concerns over public safety issues is speaking in his capacity . . . as a police officer." Platt v. Village of Southampton, 391 Fed. Appx. 62, 64 (2d Cir. 2010).  Like the police officer's duty to care for the public, Stahura-Uhl's duty is to care for her students, and thus the Second Circuit's logic applies with equal force to her.

It is also significant that Stahura-Uhl did not lodge her complaints with "sources external to the public school system." See Adams, 752 F. Supp. 2d at 429. Garcetti specifically upheld  Pickering v. Board of Education of Township High School District 205, Will County, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), where the Court found that a teacher's letter to her local newspaper expressing dissatisfaction with her school district was protected speech.  Here, conversely, Stahura-Uhl's complaints were limited to those who had a direct relationship with her students, past or present; she directed no speech to the public-at-large. In this sense, Stahura-Uhl's speech was concerned not simply with the general subject matter of her employment, which under Pickering can be protected, but involved the very nature of her job, which under Garcetti, is not.[6]

For those reasons, Defendants' motion to dismiss Stahura-Uhl's First Amendment claims is granted.[7]

---

[6]It is also of no consequence that Stahura-Uhl engaged in speech even after she was instructed to stop by her superiors. See Anemone v. Metropolitan Transp. Auth., 629 F.3d 97, 116 (2d Cir. 2011) ("The fact that [a government employee] persists in such speech after a supervisor has told [her] to stop does not, without more, transform [her] speech into protected speech made as a private citizen.").

[7]Stahura-Uhl also brings a claim alleging that her First Amendment rights were "chilled." To state such a claim, as conceded by Stahura-Uhl, a plaintiff must first show that her allegedly chilled speech was protected by the First Amendment. Because this Court has already determined her speech was unprotected, the resolution of Stahura-Uhl's retaliation claim also resolves the "chilling" claim in the Defendants' favor.

**C.      The Rehabilitation Act – Section 504[8]**

      **1.      Stahura-Uhl's Claim Against the School District**

The elements required to state a claim for retaliation under Section 504 of the Rehabilitation Act  are similar to the elements under a First Amendment retaliation claim: Stahura-Uhl must show (1) that she engaged in protected activity; (2) that Defendants retaliated against her in such a way as to deter an ordinary person from exercising his or her rights; and (3) that there was a causal connection between the protected activity and the retaliatory action. Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 148 (2d Cir. 2002).

To establish a connection between the protected activity and the adverse action, a plaintiff must allege that the protected activity was a substantial motivating factor in the adverse employment action. Cioffi v. Averill Park Cent. Sch. Dist., 444 F.3d 158, 167 (2d Cir. 2006). A plaintiff may establish causation indirectly by showing his speech was closely followed in time by the adverse employment decision. See Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).

Unlike Stahura-Uhl's First Amendment claim, Defendants do not dispute that Stahura-Uhl's advocacy on behalf of her disabled students is protected activity for the

---

[8]Section 504 of the Rehabilitation Act states, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. 794(a). There is no dispute that Stahura-Uhl, as a special education teacher advocating on behalf of her disabled students, is protected under the Rehabilitation Act.

purposes of Section 504. Rather, Defendants begin by arguing that many of the actions Stahura-Uhl complains of, were, in fact, not adverse as a matter of law. Then, conceding that the suspension in 2008 could be deemed "adverse," Defendants argue that it was too far removed from any protected activity.

Assuming for the purposes of this motion that the only adverse action was the June of 2008 suspension, Stahura-Uhl has still sufficiently pled her claim. Stahura-Uhl's last alleged act of advocacy occurred in January of 2008, when she disputed the decision to remove "Student A's" aide. (See Amended Complaint ¶¶ 125-133.) This leaves about a six month gap. Defendants assert that this is too long as a matter of law, citing cases that hold a gap of just a few months is too large. See, e.g., Richmond v. ONEOK., 120 F.3d 205, 209 (10th Cir. 1997) (finding that a three month gap was too long).

However, those holdings rest on the fact that temporal proximity was the plaintiff's *only* proof a causality.  See id. As the Supreme Court wrote, "the cases that accept *mere temporal proximity* between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). The Court then cites the same cases that Defendants refer to in their memorandum of law and concludes, "[a]ction taken (as here) 20 months later suggests, *by itself*, no causality at all. Id. at 274 (emphasis added).

At the motion to dismiss stage, of course, Stahura-Uhl is not required to present any proof at all. See ATSI Commc'ns 493 F.3d at 98 (accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor). As such, she may yet present

proof of a casual connection, and it is possible that she will not rely on mere temporal proximity, rendering Defendants' argument premature.

Because Stahura-Uhl has sufficiently alleged (and the Defendants' have conceded) that she engaged in protected activity and that Defendants took adverse action against her, she is entitled to offer proof that those actions were causally connected. Accordingly, Defendants' motion to dismiss Stahura-Uhl's Section 504 claim is denied.

### 2.    Injunctive Relief Against Individual Defendants

In her complaint, Stahura-Uhl asserts claims against the individual defendants for injunctive relief, compensatory relief, and attorney's fees. (See Amended Complaint ¶¶ 182-84.) Defendants argue that the only relief available under Section 504 against the individual defendants is injunctive relief and that she fails to "indicate the capacity in which the individual defendants are liable"; thus, Defendants argue, the claim should be dismissed.

Stahura-Uhl concedes that her only viable claim under Section 504 against the individual defendants is her claim against them in their official capacity for prospective injunctive relief. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, p. 17; Docket No. 27.)  For this narrowed cause of action, Stahura-Uhl has sufficiently stated a claim. She has alleged that the individual Defendants took retaliatory action against her for advocating on behalf of her disabled students. Because she seeks reinstatement to her position and certain documents removed from her file, she does seek prospective injunctive relief. Therefore, Defendants' motion to dismiss this claim is denied.

**D.     The Remedial Scheme of The Rehabilitation Act and Its Application to § 1983**

Stahura-Uhl seeks redress under § 1983 for alleged violations of Section 504 of the Rehabilitation Act. As noted above, on its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution.  See Graham v. Connor, 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Defendants argue that she is foreclosed from asserting claims under § 1983 because the Rehabilitation Act  provides its own remedial scheme, which in Section 505,  incorporates "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 "for persons harmed by Section 504 violations." 29 U.S.C. § 794a(a)(2).

A  plaintiff suing pursuant to § 1983 bears an initial burden of demonstrating that the federal statute she claims has been violated creates an individually enforceable right. City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005). This showing creates a "rebuttable presumption" that the right identified is enforceable under § 1983. Blessing v. Freestone, 520 U.S. 329, 341, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997). "The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." Rancho Palos Verdes, 544 U.S. at 120. To do so, the defendant must make "the difficult showing that allowing § 1983 actions to go forward in these circumstances 'would be inconsistent with Congress' carefully tailored scheme.'" Blessing, 520 U.S. at 346 (quoting Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107, 110 S. Ct. 444, 107 L. Ed. 2d 420 (1989)).

Stahura-Uhl and Defendants disagree over whether the Rehabilitation Act's remedial scheme, which is actually Title VI's remedial scheme, can be deemed "comprehensive," thus demonstrating Congressional intent to foreclose § 1983 liability. Stahura-Uhl argues that congressional intent can be gleaned from the Title VI remedial scheme itself, which provides no express private right of action. Defendants counter with case law that bars such claims. The question has not been addressed by the Second Circuit.

At least one court in this Circuit has found that a plaintiff can bring a Section 504 claim under § 1983. Considering only the burden on the Defendant and presumption in favor of the plaintiff, the court in Liparulo v. Onondaga Central School District, No. 5:06 Civ. 1068, 2009 WL 3790187, *9 (N.D.N.Y. Nov. 12, 2009), found that the plaintiff's § 1983 claim for a Section 504 violation survived summary judgment.

The Defendants, however, note that other courts in this Circuit have found otherwise. See Wasser v. New York State Office of Vocational & Educ. Servs. for Individuals with Disabilities, 683 F. Supp. 2d 201 (E.D.N.Y. 2008). However, the Wasser court's decision was limited to the question of whether "the private cause of action for judicial review found at § 722(c)(5)(J) of the Rehabilitation Act supplants the availability of any claims brought under 42 U.S.C. § 1983." Id. at 213 (emphasis added). This is not the issue before this Court because Stahura-Uhl is not bringing a claim for judicial review under Section 722, with its separate accompanying remedial scheme; instead her claim arises under Section 504, which incorporates Title VI remedies.

Defendants are correct in pointing out that other circuit courts have agreed with the their  position. See Vinson v. Thomas, 288 F.3d 1145 (9th Cir. 2002) (finding no § 1983

claim for Rehabilitation Act violations). In so ruling, the <u>Vinson</u> court expressly joined the Fifth, Eighth, and Eleventh Circuits. <u>See</u> <u>Lollar v. Baker</u>, 196 F.3d 603 (5th Cir. 1999); <u>Alsbrook v. City of Maumelle</u>, 184 F.3d 999 (8th Cir.1999) (en banc);  <u>Holbrook v. City of Alpharetta</u>, 112 F.3d 1522 (11th Cir.1997). The Third Circuit has also adopted this view. <u>See</u> <u>A.W. v. Jersey City Pub. Sch.</u>, 486 F.3d 791 (3rd Cir. 2007).

However, this Court is compelled to find differently considering the Supreme Court's more recent holding in <u>Fitzgerald v. Barnstable School Committee</u>, 555 U.S. 246, 129 S. Ct. 788,172 L. Ed. 2d 582 (2009). A history of this instructive case follows.

In 1998, the Second Circuit unequivocally determined that the Title IX remedial scheme, which is nearly identical to the Title VI scheme, is comprehensive. <u>See</u> <u>Bruneau v. S. Kortright Cent. Sch. Dist.</u>, 163 F.3d 749, 756 (2d Cir.1998). Like Title VI, Congress created no express private right of action for Title IX, instead, (and also like Title VI) it contains only an implied private right action. <u>See</u> <u>Cannon v. Univ. of Chicago</u>, 441 U.S. 677, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979). Yet, in determining whether a plaintiff bringing a Title IX  claim was  precluded from bringing a § 1983 claim, the Second Circuit concluded  "that a claimed violation of Title IX [must] be pursued under Title IX and not § 1983."  <u>Bruneau,</u> 163 F.3d at 757.[9]

However, eleven years later, this ruling was abrogated by the Supreme Court in <u>Fitzgerald</u>, where the Court found that Title IX did not, in fact, foreclose a § 1983 claim. The court affirmed its holding in <u>Rancho Palos Verdes</u>, and quoting that decision held, "'[t]he provision of an express, private means of redress in the statute itself' is a key

---

[9]The Third Circuit's ruling in <u>A.W.</u> – which found  § 1983 claims precluded under the Rehabilitation Act – relied heavily on the <u>Bruneau</u> court's reasoning.

consideration in determining congressional intent." <u>Fitzgerald</u>, 555 U.S. at 256. The Court continued:

> This Court has never held that an implied right of action had the effect of precluding suit under § 1983, likely because of the difficulty of discerning congressional intent in such a situation. Quite obviously, the search for what was Congress' remedial intent as to a right whose very existence Congress did not expressly acknowledge is unlikely to succeed. Mindful that we should not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim, we see no basis for doing so here.

<u>Id.</u> (internal quotations marks and citations omitted).

The Court found that Title IX's remedial scheme, lacking a private right of action, stands "in stark contrast" to the "unusually elaborate," "carefully tailored," and "restrictive enforcement schemes" of the statutes where the Court found that a § 1983 claim was foreclosed. <u>Id.</u> at 795.

Therefore, because the remedial scheme under Title IX and Title VI are nearly identical and because the Supreme Court has instructed that a Title IX claim can be vindicated under § 1983, this Court has no trouble concluding that the same analysis applies to Title VI, and by extension the Rehabilitation Act. Applying that analysis leads to the inevitable conclusion that the Rehabilitation scheme is not "comprehensive" and does not preclude a parallel § 1983 claim. This conclusion is buttressed by the presumption in favor of Stahura-Uhl, as noted above. Accordingly, Defendant's motion to dismiss this claim must be denied.

### E.    State Claims – Defamation and Intentional Infliction of Emotional Distress

Actions grounded in tort against a municipality or its agents, officers, and employees acting within their official capacity are permitted under the New York General Municipal

Law. N.Y. Gen. Mun. Law § 50-i (McKinney 1999). As a condition precedent to suit against a municipality or its employees, the plaintiff is required to serve on the defendant a notice of claim. N.Y. Gen. Mun. Law § 50-e (McKinney 1999).

There is no dispute that Stahura-Uhl did not file a notice of claim against Defendants and that her application to file a late notice of claim has been denied. (See New York State Supreme Court's Decision and Order; Docket No. 23-2, Exhibit B). Defendants therefore argue that her state law claims must be dismissed because they arise in the course of Defendants' official duties, thus triggering New York's notice-of-claim requirements. Stahura-Uhl concedes most of Defendants' argument, but argues that she has sued the individual defendants not in their official capacity, but in their personal capacity, which does not require the filing of a notice of claim under New York State law.

"Whether a municipal defendant's alleged unlawful conduct occurred within the defendant's scope of employment is often a question of fact," but courts are not precluded from deciding the question as a matter of law where the complaint establishes that the alleged conduct "occurred only within the scope of employment." Wrobel v. Cnty. of Erie, No. 03 Civ. 277, 2004 WL 2922087, *3 (Dec. 16, 2004 W.D.N.Y.) (citing McCormack v. Port Washington Union Free Sch. Dist., 214 A.D.2d 546, 625 N.Y.S.2d 57, 58-59 (2d Dep't 1995) (holding that plaintiff was required to comply with notice of claim provisions where complaint's assertions that school principal's actions in engaging in willful course of malicious conduct designed to defame and inflict emotional distress upon plaintiff constituted conduct "intimately related to the discharge of his duties as a principal and the legitimate goals of the [school d]istrict").

24

Although Stahura-Uhl alleges that the individual defendants acted in their personal capacity, she does so only in conclusory fashion. Defendants alleged acts, such as making false statements to staff members (Amended Complaint ¶ 52), inserting negative memorandums in her file (Id. ¶¶ 47, 71), reprimanding Stahura-Uhl at meetings (Id. ¶ 63), reprimanding her for allowing an aide to supervise her students (Id. ¶ 67), passing her over for a desired transfer (Id. ¶ 96), reprimanding her for arriving trivially late (Id. ¶ 106), suspending her (Id. ¶ 153), and transferring her various times (Id. ¶¶ 117, 167, 178), are all actions expected of a supervisor or an educational administer. See, e.g., Greenan v. Nassau Cnty., No. 04 Civ. 2158,  2007 WL 952067, *16-18 (E.D.N.Y. Mar. 29, 2007) (collecting cases and finding that a supervisor's statements about a teacher's performance were made in the scope of the supervisor's employment and subject to notice-of-claim requirements). Thus, because Defendants were acting within their official duties and because Stahura-Uhl did not file a notice of claim, Defendants' motion to dismiss her claims for defamation and infliction of emotional distress is granted.

## IV. CONCLUSION

For the reasons discussed above, Defendants' motion is granted with respect to Stahura-Uhl's First Amendment and state law claims, and the motion is denied regarding her Section 504 claims.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 23)  is

GRANTED in part and DENIED in part.


Dated:          December 15, 2011
                Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        Chief Judge
                                        United States District Court